IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| John D. Kopcial, Jr.<br><br>             Plaintiff,<br><br>      vs.<br><br>Commissioner of Social Security<br>Administration,<br><br>             Defendant. | CASE NO. 1:23-cv-0201<br><br>DISTRICT JUDGE<br>David A. Ruiz<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff John D. Kopcial, Jr. filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In December 2020, Kopcial filed an application for supplemental security income alleging a disability onset date of October 1, 2015, which he later amended to December 12, 2020.[1] Tr. 46, 155–61. Kopcial alleged that he

---

[1]      "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to "mild to extreme" pain in his hips, knees, and lower back; difficulty walking, sitting, bending, and standing; osteoarthritis in his knees; bursitis in his hips, iliotibial band syndrome;[2] a stress fracture in his right foot; the inability to exercise; and weight gain. Tr. 74. The Commissioner denied Kopcial's applications at the initial level and upon reconsideration. Tr. 74–87. In February 2022, an Administrative Law Judge (ALJ) held a hearing at which Kopcial and a vocational expert testified. Tr. 40–73. Less than two weeks later, the ALJ issued a written decision finding that Kopcial was not disabled. Tr. 11–39. The ALJ's decision became final in December 2022, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981.

Kopcial filed this action in February 2023. Doc. 1. In it, he asserts that the ALJ failed to support with substantial evidence the finding that Kopcial retained the residual functional capacity (RFC)[3] to perform light work with additional restrictions. Doc. 8, at 8–9, 11–12, 13–19. Kopcial also claims that the ALJ failed to support with substantial evidence the finding that there were a significant number of jobs in the national economy that Kopcial could

---

[2]    Iliotibial band syndrome is an overuse injury typically seen in athletes caused by the iliotibial band repetitively rubbing against the lateral femoral epicondyle—a projection at the distal end of the femur that attaches to the knee—as the hip is repeatedly extended and flexed. Dorland's Illustrated Medical Dictionary 624, 1804 (33rd ed. 2020).

[3]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

perform. Doc. 8, at 19–20.

Kopcial previously filed an application for supplemental security income in March 2019. Tr. 91, 103–13. In the prior application, Kopcial alleged a disability onset date of October 1, 2015. Tr. 91. An ALJ held a hearing in August 2020 and later issued a written decision finding that Kopcial was not disabled. Tr. 91–99. The prior ALJ found that Kopcial had the RFC to perform light labor with additional limitations. Tr. 91–99. Kopcial's relevant time period here began after the prior ALJ issued her decision. *See* Tr. 91, 46.

## Factual background

### 1. Personal and vocational evidence

Kopcial was born in March 1968 and was 53 years old on the amended alleged disability onset date of December 12, 2020. Tr. 42, 46, 74, 155. He graduated from high school and earned a bachelor's degree from The Ohio State University. Tr. 155. Kopcial previously owned a closed-circuit television business through which he installed surveillance equipment and trained business owners to use the equipment. Tr. 48–49.

### 2. Medical evidence[4]

Radiographs of Kopcial's lumbar spine in January 2020, nearly a year before Kopcial's amended alleged disability onset date in December 2020,

---

[4]     This recitation of medical evidence is not intended to be exhaustive. It is limited to relevant facts that were submitted by the parties in their briefs.

showed mild disc space narrowing at L2–L3, L3–L4, and L4–L5 with small anterior marginal osteophytes.[5] *See* Tr. 269–70.

In March 2021, Kopcial established care with rheumatologist Ann Igoe, M.D., for bilateral[6] hand pain. Tr. 384. Kopcial described his pain as "dull" and rated it at an "11" out of ten.[7] *Id*. He indicated that his pain had lasted for decades. *Id*. Kopcial reported that "hard gripping," like using a screwdriver, caused extreme pain in the heel of his hand. *Id*. Kopcial denied numbness, tingling, and weakness and said that his activities of daily life were not affected by his bilateral hand pain. *Id*. Dr. Igoe referred Kopcial for occupational therapy. *See* Tr. 304.

---

[5]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*.

An osteophyte is an abnormal or morbid bony outgrowth. Dorland's Illustrated Medical Dictionary 650, 1329 (33rd ed. 2020).

[6]     Bilateral describes something that pertains to both sides. *See* Dorland's Illustrated Medical Dictionary 211 (33rd ed. 2020).

[7]     Later, Kopcial clarified with occupational therapist Ted Chapman that his pain was agonizing—an "11" out of ten—with forceful use of his hands during activities including the use of hand tools. Tr. 387.

Occupational therapist Ted Chapman, OTR/L, CHT,[8] conducted an initial evaluation in April 2021. Tr. 304–07, 387–89. Using a scale of one to ten with ten as the most severe, Kopcial said that his average pain was a "0," his pain at its worst was a "10," and his pain with activity was an "11." Tr. 387. He reported aggravating factors including the use of a screwdriver and other hand tools and "simply using sand paper." *Id*. Kopcial said that he did not experience swelling in his right hand. Tr. 305. Chapman found that Kopcial's right and left hands and wrists had respective ranges of motion "within functional limits." Tr. 305, 306. 306. Chapman conducted multiple specialized tests of Kopcial's hands, wrists, and forearms, all of which had normal results. Tr. 306. Chapman diagnosed Kopcial with a "moderately complex hand/thumb impairment" and expressed concern about Kopcial's future risk for "long term disability and poor functional use of [his] hands," which could lead to "an inability to effectively use [his] hand[s] for lifting [or] carrying and grasping activities" and ultimately cause "functional deficits." Tr. 307. Chapman set up an eight-week therapy plan with goals including improved function, demonstrable independence with exercise at home, and minimal difficulty

---

[8]     OTR/L is an abbreviation that indicates someone is an occupational therapist (OT) who is registered (R) with the national board and licensed (L) by his or her particular state. *See* Sarah Lyon, OTR/L, *The ABC's of OT Specialty Certifications and Credentials*, Verywell Health, https://www.verywellhealth.com/occupational-therapy-degrees-and-training-2509970 [https://perma.cc/QES3-RQJ9]. CHT is an abbreviation for certified hand therapist. *Id*.

using tools in simulated work tasks. Tr. 307. Kopcial saw Chapman for at least one follow-up in May 2021. Tr. 372–74.

Kopcial sought emergency medical care for shoulder pain in June 2021. Tr. 312, 315. His right shoulder was tender and he had a decreased range of motion. Tr. 317, 329. Kopcial denied weakness on his left side, in which he had a full range of motion. Tr. 329. X-rays taken of Kopcial's cervical spine in the emergency department showed degenerative disc disease from C5 to C7 with disc space narrowing at C5–C6. Tr. 317–18. X-rays of Kopcial's right shoulder showed mild elevation of the clavicle with respect to the acromion which may have indicated joint separation. Tr. 318, 398. Kopcial was given a steroid injection and instructed to follow-up with an orthopedic specialist. Tr. 318.

In mid-June, Kopcial saw physical therapist Thomas Parkhurst and complained of right foot pain. Tr. 364–66. Kopcial reported having pain for two months that was aggravated by stairs, walking, and work boots. Tr. 364. He attributed his foot pain to a stress fracture he sustained eight years earlier in 2013. *Id*. Kopcial said he was currently working as a self-employed surveillance camera installer. *Id*.

At the end of June 2021, Kopcial established care with certified nurse practitioner Deana Fanello at Ohio Health Orthopedics & Sports Medicine Physicians to address "pain in the right side of [his] neck with pain and numbness and tingling that radiate[d] down his right arm" to his elbow, hand, fingers, thumb, and index finger. Tr. 396. Kopcial reported a burning sensation

in his intrascapular area and occasional headaches. *Id*. He described his pain as "dull, sharp, and aching" and said that his symptoms began two years earlier when he lifted plywood over his head. *Id*. Kopcial said that he tried alleviating his pain by resting and avoiding aggravating activities but his efforts had not led to significant relief. *Id*. Kopcial indicated that his inability to grip and lift affected his activities of daily living and that his overall symptoms interrupted his sleep. *Id*. Fanello found that Kopcial had a "markedly positive" Spurling test on the right side.[9] Tr. 396. She ordered electromyography of Kopcial's right wrist.[10] *Id*. She found that Kopcial had pain in his trapezium, a normal range of motion in his shoulders, and that he was negative for Hoffman's sign.[11] Tr. 397, 398. Fanello examined Kopcial's right shoulder and conducted several specialized tests, all of which had normal, negative results. Tr. 398. Fanello wrote that "formal physical therapy" to address "these issues" had not been attempted so she added physical therapy

---

[9]     Spurling's test is for cervical radiculopathy. Dorland's Illustrated Medical Dictionary 1870 (33rd ed. 2020). The examiner applies pressure to the top of the head while the patient rotates the head laterally until hyperextension. *Id*. Radiculopathy is indicated if the patient experiences pain radiating into the upper limb. *Id*.

[10]     Electromyography (EMG) is diagnostic testing that records the responses of muscles at rest, in contraction, and during electrical stimulation. *See* Dorland's Illustrated Medical Dictionary 595 (33rd ed. 2020). An electromyogram is the record that results from an EMG. *Id*.

[11]     Hoffman's sign is observed in sensory nerves with increased excitability to electrical stimulation and is usually used to test the ulnar nerve. Dorland's Illustrated Medical Dictionary 1408 (33rd ed. 2020).

as well as medication—Medrol, because "Flexeril [did] not help"—to Kopcial's treatment regimen. Tr. 396.

In July 2021, Kopcial saw physical therapist Susie Leuthold at Ohio Health Orthopedics & Sports Medicine Physicians. Tr. 400–01. Leuthold found that Kopcial's muscle strength was within functional limits. Tr. 400. She observed numbness in Kopcial's right arm and determined that his potential for rehabilitation was good. *Id*. Leuthold prescribed a four-week treatment plan that included twice weekly physical therapy. *Id*. Kopcial returned for six subsequent sessions over the following four weeks. *See* Tr. 400–12.

In August 2021, Kopcial had a follow-up with Dr. Igoe for his bilateral hand pain. Tr. 412–16. Kopcial reported that for nine weeks, he had been experiencing numbness and tingling in his right upper extremity, "mostly from the elbow down." Tr. 413. He denied numbness or weakness in any other extremities. Tr. 414. Dr. Igoe found x-rays of Kopcial's hands unremarkable. Tr. 412.  Kopcial's neurological examination was normal without any focal deficits. *Id*. He had crepitus in his knees but no effusion or warmth. *Id*. Dr. Igoe injected Kopcial's hip with steroids to address a bursa and noted that Kopcial tolerated the procedure well. Tr. 414, 415.

In November 2021, Kopcial saw Michael Roger Vlau, M.D., at Ohio Health Orthopedics & Sports Medicine Physicians to address carpal tunnel syndrome without axonal damage in his right wrist and numbness and tingling in his right upper extremity. Tr. 427–31. Dr. Vlau wrote that "it should be

noted [that] for [the] last several weeks or at least a few weeks[,] [Kopcial] has been relatively asymptomatic." Tr. 427. Kopcial denied recent sleep interruption and did not have any significant neck pain during the visit. *Id.*

### 3. *State agency and other medical opinion evidence*[12]

In March 2021, consultative examiner Christopher D'Amico, D.O., conducted a physical evaluation. Tr. 278–91. Dr. D'Amico noted that Kopcial arrived alone to the appointment and appeared to be a "reliable historian." Tr. 278. Kopcial reported a history of musculoskeletal issues in his back, hips, knees, and right foot. Tr. 278. Kopcial indicated that he had iliotibial band syndrome, degenerative disc disease, osteoarthritis, and bursitis. *Id.* He told Dr. D'Amico that he had severe pain in the areas affected by his conditions, had gained weight, and had difficulty sitting, standing, walking, and bending. *Id.* Kopcial listed his medications—Meloxicam, Fexofenadine, Cyclobenzaprine, and Ibuprofen—and said that he took them "as needed." *Id.*

---

[12]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

Dr. D'Amico found that Kopcial had elevated blood pressure and an antalgic gait.[13] Tr. 281, 282, 284. Dr. D'Amico observed "tenderness of [the] greater trochanter bilaterally" but "[n]o joint swelling or effusion, erythema or deformity."[14] Tr. 281. Kopcial was "able to lift, carry, and handle light objects." *Id*. His "fine and gross manipulative abilities were grossly normal." *Id*. Dr. D'Amico found Kopcial able to "squat and rise from that position with ease" as well as "rise from a sitting position … and … get up and down from the exam table with ease." *Id*. As a result of bilateral hip and knee pain, Kopcial had "mild limitations with standing and walking[,]" mild limitations with lifting and carrying[,]" and "limitations with bending, stooping, crouching[,] and squatting[.]" Tr. 282. Dr. D'Amico found that Kopcial had no limitations with sitting, reaching, grasping, handling, fingering, or feeling. *Id*. Dr. D'Amico rated Kopcial's grip strength at a "5" out of five. Tr. 284.

Dr. D'Amico reviewed radiographs of Kopcial's right hip and right knee. Tr. 288–89. The hip x-rays showed mild arthrosis,[15] multiple pelvic

---

[13]     An antalgic gait is a disrupted walking pattern usually caused by a person trying to avoid pain. *Antalgic Gait: Causes, Symptoms, and Treatment*, Healthline, Health Conditions, https://www.healthline.com/health/antalgic-gait [https://perma.cc/H3DT-9VUV].

[14]     The greater trochanter is the outermost process—bony projection—at the top of the femur. Dorland's Illustrated Medical Dictionary 1940 (33rd ed. 2020). Erythema is "redness of the skin produced by congestion of the capillaries." Dorland's Illustrated Medical Dictionary 505 (33rd ed. 2020).

[15]     Arthrosis is joint disease. Dorland's Illustrated Medical Dictionary 155, 156 (33rd ed. 2020).

phleboliths,[16] and density along the superlateral[17] aspect of the joint which might have been a "tiny" bone spur. Tr. 288–89. The knee x-rays showed no significant degenerative changes. Tr. 290–91.

In April 2021, state agency consulting physician Lynne Torello, M.D., reviewed the medical evidence. Tr. 74–79. Dr. Torello found that despite severe musculoskeletal impairments, Kopcial retained the RFC to occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. Tr. 77. Accordingly to Dr. Torello, Kopcial could stand, walk, and sit for a total of about six hours in an eight-hour workday. *Id.* Kopcial had the RFC to occasionally climb ramps, stairs, ladders, ropes, and scaffolds. *Id.* He could occasionally stoop, kneel, crouch, and crawl. *Id.* Dr. Torello opined that Kopcial was capable of performing labor at a light level of exertion without any manipulation limitations. Tr. 78.

In July 2021, state agency consulting physician W. Scott Bolz, M.D., reviewed the evidence upon reconsideration and adopted Dr. Torello's findings. Tr. 85–86.

---

[16]    Phleboliths are tiny, calcified masses in the veins. *Pelvic Phleboliths: What Causes Them and How Are They Treated?,* Healthline https://www.healthline.com/health/pelvic-phleboliths [https://perma.cc/XA9X-P2DQ]. When these calcifications are found in the pelvis, they are called pelvic phleboliths. *Id.*

[17]    The prefix super- means above. *See* Dorland's Illustrated Medical Dictionary 1773 (33rd ed. 2020). Lateral indicates that something is farther away from the midline of the body or a structure, in this case, the right hip. *Id.*, at 994.

11

### 4. Additional evidence

After the medical opinions had been completed but before the ALJ held the hearing, Kopcial offered additional medical records consisting of the results from an EMG in October 2021 and magnetic resonance imaging (MRI) from December 2021. Doc. 8, at 14. The EMG showed median motor nerve entrapment in Kopcial's right wrist without axonal damage or acute denervation. Tr. 417–18, 428. His right median sensory nerve was normal, as were his left motor and sensory nerves. Tr. 417. The MRI focused on Kopcial's cervical spine and showed mild to moderate multilevel degenerative disc disease and facet arthropathy most significantly between C5 and C7. Tr. 454–55. At both C5–C6 and C6–C7, Kopcial had "diffuse broad-based" disc bulges with spinal canal stenosis and bilateral foraminal stenosis secondary to disc degeneration and facet arthropathy.[18] Tr. 455. At C5–C6, Kopcial had mild to moderate spinal canal stenosis and moderate to severe bilateral foraminal stenosis that was greater on the right side than the left. *Id.* He had moderate

---

[18] Spinal canal stenosis happens when the space around the spinal canal becomes too narrow, which irritates the spinal cord or the nerves that branch from it. Spinal Stenosis, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis [https://perma.cc/NT9S-SZL3]. Foraminal stenosis is a type of spinal stenosis that affects the neural foramen, a series of openings on the sides of the spine. *Foraminal Stenosis*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis [https://perma.cc/JCT6-HVGZ].

spinal canal stenosis and moderate to severe bilateral foraminal stenosis at C6–C7. *Id.*

### 5. *Function Report*

Kopcial completed a function report in February 2021. Tr. 197–205. Kopcial wrote that chronic conditions in his lower back, hips, knees, right tibia, and right foot limited his ability to "sit, stand, bend, kneel, reach, lift, walk, etc." Tr. 197. He said that he lived in a house by himself, prepared his own meals, and completed household chores such as laundry, cleaning, and mowing the lawn. Tr. 197, 199. Two to three times each month, Kopcial shopped for himself in the grocery store. Tr. 200. Sometimes, "the neighbor kid" helped Kopcial with his grocery shopping. *Id.* Kopcial went outside "2-3 times a week (maybe less)" and got around by driving his own car. *Id.*  Kopcial said that he was able to take care of animals, explaining that he and "[the] neighbor kid" fed, watered, and bought pet food for "a few "trap, fix, and release" cats[.]" Tr. 198.

### 6. *Testimonial evidence*[19]

Kopcial and a vocational expert testified during the hearing in October 2021. Tr. 40–73. Kopcial was represented by attorney David Dick, who had also

---

[19]     Kopcial omitted any mention of his own testimonial or written evidence in the facts section of his brief. *See* Doc. 8, at 1–6. The Court's initial order specifically instructed Kopcial that "[t]he Court will deem waived a party's reliance on any evidence not included in the party's brief(s)." Doc. 5, at 4. As such, this recitation of the testimonial evidence is limited to the facts provided in the Defendants' brief and those other facts necessary for context.

represented Kopcial in his prior application. Tr. 40. Before the substantive portion of the hearing began, Attorney Dick told the ALJ that "to [Dick's] knowledge," there wasn't any outstanding evidence. *See* Tr. 43. Dick amended Kopcial's alleged onset date to December 12, 2020. Tr. 46. Dick gave an opening statement advocating that the ALJ find Kopcial disabled. Tr. 44–46. Kopcial was then sworn in. Tr. 47–64.

Kopcial testified, in pertinent part, that he was unable to work due to nerve pain in his hands. Tr. 50. He said that he suffered from carpal tunnel syndrome in his right wrist and pinched nerves in both hands. *Id.* Basic tasks— removing and cleaning his glasses, gripping a knife to chop up fruits and vegetables, using a screwdriver—caused extreme pain. Tr. 51–52, 57. He struggled to open packages because of his grip issues. Tr. 54. Kopcial used to pride himself on his penmanship but could no longer write legibly. Tr. 54.

Kopcial described completing tasks incrementally and claimed that he could only "handl[e], stand[], sit[], or walk[]" for ten to 15 minutes before hitting his "limit … [and] need[ing] to go sit down." Tr. 52. If Kopcial turned his head too quickly, grabbed something, held something, or raised his arms above his head, these actions among others caused him moderate to severe pain that lasted for "minutes, hours, days, weeks, months, … or all of the above." Tr. 53.

Kopcial discussed his cervical neck and shoulder issues. Tr. 47, 55–57, 61, 63–64. He said, for example, that it was hard for him to drive because

turning his head from side to side could trigger his pain. *See* Tr. 47. In the time between the denial of his prior application and his hearing testimony in October 2021, Kopcial said that his neck and shoulder pain had worsened. Tr. 55–56, 61, 63–64. He treated his pain by attending physical therapy and taking medication. *Id*. Kopcial said that Ibuprofen, Meloxicam, and Cyclobenzaprine "did nothing." *Id*. Tramadol, an opiate, helped Kopcial although he was concerned about taking it due the "obvious issues" caused by the prolonged use of opiates. *Id*. None of Kopcial's providers had suggested surgery. Tr. 57.

After Kopcial, vocational expert George Coleman testified. Tr. 64–72. According to Coleman, a hypothetical individual with the same age, education, and work experience as Kopcial, with the limitations assessed in Kopcial's RFC, described below, could not perform Kopcial's past work. Tr. 65. Such an individual could, however, perform light, unskilled labor as, for example, an office helper or clerical assistant, parking lot attendant, or storage facility rental clerk. Tr. 65–66. This individual would not have any transferrable skills. Tr. 66. A limitation to only occasional handling and fingering would be preclusive of all work. Tr. 67. Being absent more than once a month on a consistent basis or being off task more than 10% of the workday would also preclude such an individual from all work. Tr. 67–68.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1. Based on the claimant's earnings record, he has not engaged in [substantial gainful employment]

since December 12, 2020, the application date and amended alleged onset date of disability (20 CFR 416.971 *et seq.*).

2.  Based on the objective medical evidence, the claimant has the following severe combination of impairments as of the application date and amended alleged onset date of disability: degenerative changes of the cervical and lumbar spine, right carpal tunnel syndrome ("CTS"), hip osteoarthritis, and shoulder separation, and left iliotibial band syndrome and hip bursitis (20 CFR 416.920(c)).

3.  Based on the objective medical evidence, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the criteria of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 as of the application date and amended alleged onset date of disability (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light1 work as defined in 20 CFR 416.967(b). Fingering, handling, and reaching in directions other than overhead with the upper extremities, are each limited to no more than frequently. Climbing ladders, ramps, ropes, scaffolds, and stairs, crawling, crouching, kneeling, overhead reaching with the upper extremities, and stooping, are each limited to no more than occasionally.

5.  Based on the claimant's residual functional capacity as of the application date and amended alleged onset date of disability, he cannot perform his past relevant work (20 CFR 416.965).

6.  The claimant was born [in March 1968] [Tr. 194], and he is defined as an individual closely

approaching advanced age on the application date and amended alleged onset date of disability, and at all times relevant herein (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964) [Tr. 187].

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not he has transferable job skills (SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity as of the application date and amended alleged onset date of disability, jobs exist in significant numbers in the national economy that he can perform (20 CFR 416.969 and 416.969a).

10. Because jobs exist in significant numbers in the economy that the claimant can perform, he is not disabled as defined in the Social Security Act since December 12, 2020, the application date and amended alleged onset date of disability (20 CFR 416.920(g)).

Tr. 17–35.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

18

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d

1147, 1150 (8th Cir. 1984).

## Discussion

*1. Whether substantial evidence supports the ALJ's determination that Kopcial had the RFC to perform light work with additional limitations.*

The ALJ found Kopcial's "degenerative changes in the cervical and

lumbar spine, right carpal tunnel syndrome (CTS), hip osteoarthritis, …

shoulder separation, and left iliotibial band syndrome and hip bursitis" to be

severe impairments. Tr. 18 (citing 20 C.F.R. 416.920(c)). In the RFC, however,

the ALJ determined that Kopcial was nonetheless capable of light work[20] with

a few additional limitations. Tr. 24. These limitations included only

occasionally crawling, crouching, kneeling, stooping, or climbing a ladder,

ramp, rope, scaffolding, or stairs. *Id*. They also included reaching overhead no

---

[20]    "To determine the physical exertion requirements of work in the national economy," the Social Security Administration "classif[ies] jobs as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. § 416.967. And:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [one] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

more than occasionally and fingering, handling, and reaching in directions other than overhead frequently. *Id*.

Kopcial asserts that the ALJ did not properly evaluate his manipulative abilities to finger, handle, and reach. Doc. 8, at 8. He claims that "[t]he record does not contain a medical opinion or other evidence supporting the ability to frequently finger, handle, and reach," and "lacks sufficient evidence to support the ALJ's interpretation of [Kopcial's] manipulative abilities and general physical functioning." *Id*.

The ALJ found that despite multiple severe and nonsevere impairments, Kopcial's functional limitations did not meet the Social Security Administration's "durational requirement" within the relevant time period. *See* Tr. 19; 20 C.F.R. 416.909 ("unless [an] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the durational requirement."). The ALJ cited evidence in support of this finding. For example, the ALJ wrote that there was "no evidence documenting nerve root compromise" in Kopcial's cervical neck and cited "spinal diagnostic imaging results" which did not mention "nerve root compromise or impingement." Tr. 21 (citing Tr. 269–70, 273–75, 317, 323, 392, 398, 454, 455). The ALJ wrote that Kopcial did not provide any evidence demonstrating that he would not be able to "initiate, sustain and complete" vocational tasks implicating fine and gross movement with at least one of his upper extremities. Tr. 21. The ALJ noted that there was no evidence of

21

atrophy. *Id*. The ALJ indicated that he arrived at Kopcial's RFC after reviewing the objective medical evidence, medical opinion evidence, and Kopcial's own statements as to his abilities and limitations, including his activities of daily living. Tr. 17–24, 30.

The ALJ considered Kopcial's upper extremity impairments—cervical neck pain, chronic pain in his hands, right shoulder pain with radiating numbness and tingling to his elbow and hand—and acknowledged that Kopcial had testified about symptoms "more incapacitating" as well as alleged functional limitations "in contrast to" the RFC. Tr. 25. As explained below, however, the ALJ provided a sufficient basis for his RFC finding that Kopcial nonetheless could occasionally reach overhead and frequently finger, handle, and reach in all other directions. Tr. 22, 25.

The ALJ considered Kopcial's bilateral hand pain and difficulty with gripping and lifting. Tr. 25. (citing Tr. 206, 372–79, 384, 387–89, 396, 412). The ALJ cited treatment notes finding Kopcial's left grip strength slightly decreased as compared to his right. Tr. 25 (citing Tr. 306). The ALJ also cited evidence to support the finding that this impairment did not prevent Kopcial from performing light work with additional manipulation limitations. For example, the ALJ highlighted the results of the October 2021 EMG which showed no cervical radiculopathy, brachial plexopathy, or neuropathy in Kopcial's left median or right ulnar nerve. Tr. 26 (citing Tr. 418). The ALJ

noted that, at times, Kopcial "did not demonstrate effusion.[21]" *Id.* (citing Tr. 281, 414). The ALJ discussed radiographs of Kopcial's hands from April 2021 that showed "anatomic joint alignment, preserved joint spaces, soft tissues within normal limits, … no acute fracture [or] osseous abnormality, and no suspicious hypertrophic changes involving the carpal bones at the base of [Kopcial's] thumbs." Tr. 21–22 (citing Tr. 302, 303). The ALJ pointed to Kopcial's negative—normal—2021 test results for Romberg's sign in March, Hoffman's sign in June, and Spurling's sign in July and August. Tr. 21 (citing Tr. 281, 398, 400, 414).

The ALJ considered Kopcial's neck pain "with upper trapezius and spinous process tenderness, decreased sensory, and positive cervical compression, [and] Spurling … and distraction sign and test results." Tr. 25 (citing Tr. 312, 396, 398, 400–11, 427). He acknowledged Kopcial's claims of radiating shoulder pain "with decreased range of motion and strength, and right upper extremity numbness and tingling." *Id.* (citing Tr. 315, 317, 319, 329–30, 396, 427–28). The ALJ discussed Kopcial's attending physical therapy for his neck and shoulder issues. Tr. 25 (citing Tr. 396, 400–11). The ALJ also noted Kopcial's negative—normal—April 2021 results from multiple specialized tests for issues in the hands, wrists, forearms, and nerves, Tr. 22 (citing Tr. 306) and his negative sign and test results seven months later, *id.*

---

[21]     Effusion is excessive fluid in a part of the body. *See* Dorland's Illustrated Medical Dictionary 589 (33rd ed. 2020).

(citing Tr. 427). The ALJ considered the normal, negative findings in Nurse Fanello's notes from June 2021 after multiple specialized tests on Kopcial's right shoulder, Tr. 22 (citing Tr. 398), and Kopcial's lack of "carpometacarpal [or] proximal interphalangeal synovitis," *id*. (citing Tr. 414).

The ALJ continued to cite to the objective medical evidence throughout his decision. He observed that Kopcial did not suffer from chronic edema, *id*. (citing Tr. 280, 413), and endorsed overall good health, Tr. 22 (citing Tr. 305). The ALJ referred to treatment notes finding that Kopcial had "normal bilateral fine and gross motor abilities[,] 5/5 bilateral grip strength[,] … intact right shoulder neurological and vascular status[,] ... full left upper extremity range of motion[,]" and the ability to "carry, handle, and lift light objects." Tr. *Id*. (citing Tr. 281, 284, 317, 329). The ALJ noted that Dr. Amico found throughout his examination that Kopcial was "entirely normal" with a full range of motion and full strength. Tr. 22 (citing 283–87). The AJL highlighted Nurse Fanello's finding that Kopcial had "right shoulder abduction, extension, and forward flexion without limitations." *Id*. (citing Tr. 398). In June 2021, Kopcial's hands, wrists, and left- and right-side muscle strength were within functional limits. *Id*. (citing Tr. 306–06, 400). He denied "numbness and tingling in his hands, … weakness and spasm, [and] state[ed] that he only experience[d] problems with forceful gripping." *Id*. (citing Tr. 384, 412). Kopcial said that his conditions did not affect his activities of daily living. *Id*. (citing Tr. 384). Treatment notes recorded Kopcial's "[denial of] chronic numbness and weakness in his

extremities, … full range of motion [in] his lower extremities[,] … and … normal sensory and neurological exams" with "intact, normal cranial nerves" and sensory function. *Id*. (citing Tr. 279–80, 281, 317, 330, 385, 396, 414).

In addition to the objective medical record, the ALJ showed that he relied on Kopcial's own written and oral statements in developing the RFC. *See, e.g.*, Tr. 19, 20, 22–23, 25, 27. For example, concerning Kopcial's upper extremity and neck issues, the ALJ noted that in the function report, Kopcial said that he had personal grooming difficulties. Tr. 25 (citing Tr. 198). Kopcial wrote that his impairments affected his ability to get dressed and bathe. Tr. 198. Kopcial explained—somewhat vaguely—that these activities were "painful." *Id*. The ALJ pointed out, however, that Kopcial made other statements regarding his ability to perform activities of daily living involving "significant usage of the upper and lower extremities." Tr. 22. The ALJ noted that Kopcial "trapped, fixed, and released" cats and looked after their food and water needs. Tr. 22 (citing Tr. 198). He used the telephone. *Id*. (citing Tr. 310, 384). He maintained an e-mail account. Tr. 23 (citing Tr. 185). He lived alone. Tr. 22 (citing Tr. 197). He prepared his own meals daily, did household chores including laundry and cleaning, and mowed his own lawn. *Id*. (citing Tr. 199). He took his medication without any help or special reminders. *Id*. Kopcial left his house on his own multiple times per week and drove wherever he needed to go. *Id*. (citing Tr. 200). Kopcial managed his own money—counting change, handling a savings account, paying bills, and using checks or money orders—

and shopped in stores. *Id*. (citing Tr. 185, 200). In June 2021, as the ALJ pointed out, Kopcial reported that he was working as a surveillance camera installer. Tr. 23 (citing Tr. 364).

So, the ALJ explained the rationale for his findings with support from substantial evidence in the record.

A. *Whether the ALJ properly considered the medical opinion and other evidence when evaluating Kopcial's manipulative abilities and limitations.*[22]

State agency consulting physician Dr. Lynne Torello conducted the initial review of Kopcial's claim in April 2021. Tr. 74–79. Dr. W. Scott Bolz conducted the review of Kopcial's claim upon reconsideration. Tr. 82–87. Both found that Kopcial could only occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. Tr. 77, 85. They agreed that Kopcial had no manipulative limitations and an unlimited capacity for pushing and pulling. *Id*. Both doctors found that Kopcial had "mild limitations with lifting and carrying weight due to bilateral hip and knee pain." Tr. 76, 84. Neither placed any limitations on Kopcial's reaching, grasping, handling, fingering, or feeling. Tr. 77, 84.

In the decision, the ALJ indicated that he developed the RFC in consideration of "all medical and other opinions and statements in accordance with" the regulations set forth by the Social Security Administration. Tr. 29

---

[22]    Kopcial's legal argument is neither focused nor entirely clear. I have included discussion headings based on what he appears to be arguing.

(citing 20 C.F.R. 416.920(c) ("[To be found disabled, one] must have a severe impairment. If [a claimant] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities, we will find that [he or she] do[es] not have a severe impairment and [is], therefore, not disabled."). The ALJ discussed his consideration of the "overall persuasive" opinions of Dr. Torello and Dr. Bolz. Tr. 29 (citing Tr. 77–78, 85–86).

The ALJ's RFC incorporated Dr. Torello's and Dr. Bolz's assessed limitations with two notable exceptions. Due to Kopcial's "right shoulder condition and upper trapezius and spinous process tenderness," the ALJ found that Kopcial's reaching abilities were more restricted than the state agency doctors recommended. *See* Tr. 24, 29, 77–78, 85–86. And in consideration of Kopcial's right carpal tunnel syndrome and bilateral hand pain, the ALJ found that Kopcial's handling and fingering abilities were more restricted than the state agency doctors assessed. *See id*.

Kopcial argues that in evaluating his fingering, handling, and reaching abilities, the ALJ improperly relied on the opinions of the state agency doctors. Doc. 8, at 11–13. Kopcial appears to argue that the ALJ also improperly relied on his own "lay interpretation" of raw medical data. *Id*. at 11. This simply is not the case.

First, the ALJ could not *improperly* rely on the findings of the state agency doctors as to Kopcial's handling, fingering, and reaching limitations

27

because, as the ALJ stated, the ALJ did not rely on the findings of the state agency doctors as to Kopcial's handling, fingering, and reaching limitations. *See* Tr. 29.

Second, Kopcial's argument ignores the plain language of the ALJ's decision, in which the ALJ explained his rationale for the RFC's stricter limitations on manipulation. *See, e.g.*, Tr. 21, 22, 25. There is nothing to show that the ALJ determined the RFC based on a lay understanding of raw medical data. Instead, the record reveals that the ALJ arrived at his conclusions after reviewing objective medical evidence and Kopcial's written and oral statements. *See* Tr. 21, 22, 25.

Third, as noted, the ALJ determined an RFC including fingering, handling, and reaching limitations that were more restrictive than those recommended by the state agency doctors. *Compare* Tr. 24, *with* Tr. 77–78, 84–85. Kopcial cannot point to any medical opinion with limitations more restrictive of his handling, fingering, and reaching abilities than the ALJ's RFC. So, even if the ALJ erred in analyzing the state agency findings, the error—which benefitted Kopcial—would be harmless at best. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions than the state agency reviewers opined") (citations omitted); *Berrier v. Comm'r of Soc. Sec.*, No. 3:20-CV-01655, 2021 WL 6881246, at *9 (N.D. Ohio Sept. 10, 2021), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan.

21, 2022); *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017). So Kopcial's argument fails.[23]

With respect to the additional evidence—radiology reports—that Kopcial submitted after the medical opinions were completed, the ALJ reviewed this evidence and incorporated it into his rationale. *See* Tr. 18 (writing at step two, in support of the finding that degenerative changes of the cervical and lumbar spine were a severe impairment, "Magnetic resonance imaging ("MRI") scan results from December 2021 documented mild to moderate multilevel degenerative disc disease and facet arthropathy, most significant at C5–C7.") (citing Tr. 454–55); *see also* Tr. 26 (writing, in support of the finding that Kopcial's allegations were inconsistent with and unsupported by the totality of the evidence, "The claimant's October 2021 EMG results did not document cervical radiculopathy, brachial plexopathy, and left median or right ulnar neuropathy.") (citing Tr. 418). The ALJ then directly addressed the fact that the state agency doctors did not have the benefit of Kopcial's additional evidence when they developed their opinions. Tr. 29. He explained why he still found their opinions persuasive overall, writing that:

> [t]he evidence received into the record after the remainder of [the state agency doctors's] opinions concerning the claimant's physical status did not provide any credible or objectively supported new and material information that would alter these

_____

[23]    Kopcial says that the ALJ was required to obtain a medical opinion to support his RFC determination because it was more restrictive than what the medical opinions called for. Doc. 8, at 16. But Kopcial is in no position to assert as error, something that benefitted him.

> findings concerning his functional limitations and restrictions as of the application date and amended alleged onset date of disability.

*Id*.

Kopcial asserts that the ALJ "was required to obtain an opinion from a treating and/or examining source" because the ALJ "was not qualified to interpret [Kopcial's] abilities and limitations contained in [those] records. Doc. 8, at 16 (citing *Laura B. v. Comm'r of Soc. Sec. Admin.*, 2023 WL 355033, *4 (S.D. Ohio Jan. 23, 2023), *report and recommendation adopted* 2023 WL 2988459 (S.D. Ohio Feb. 8, 2023) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008). He claims that the ALJ "should have requested an opinion from a treating medical source, obtained a consultative examination, or obtained a medical expert to review the complete medical history" and asserts that the additional evidence he submitted was a "critical body of objective evidence" which was "never medically evaluated." Tr. 17 (citing *Falkosky v. Comm'r of Soc. Sec.*, 2020 WL 5423967, *8 (N.D. Ohio Sept. 10, 2020) (additional citations omitted).

As the Commissioner points out, however, an ALJ is not required to review *any* medical opinion, let alone have a newly generated one, before crafting an RFC. Doc 11, at 16. (citing *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding")); *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*,

732 F. App'x 395, 401 (6th Cir. 2018); *Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015) (affirming that "neither the applicable regulations nor Sixth Circuit law limit the ALJ to consideration of direct medical opinions on the issue of RFC" and, moreover "none of the[] cases [cited by the claimant] even remotely suggests that an ALJ must, as a matter of law, seek out a physician's medical opinion where one is not offered."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the plaintiff's argument that the ALJ is required "to base her RFC finding on a physician's opinion").

Oddly enough, Kopcial appears to argue—based on the raw medical data contained in the additional evidence—that the ALJ should have decided Kopcial's case in Kopcial's favor, or determined that he needed another medical opinion. *See* Doc. 8, at 12–13. Kopcial essentially criticizes the ALJ for not relying on the raw data from the EMG and the MRI and making a lay interpretation of its import. *See id.* This is the very thing that Kopcial later argues that the ALJ should not have done. *See* Doc. 8, at 11.

Moreover, even if, as Kopcial alleges, the ALJ relied on outdated state agency opinions in developing Kopcial's handling, fingering, and reaching RFC, Doc. 8, at 16, the Sixth Circuit has held that an ALJ may rely on medical opinions from physicians who did not review the entire record so long as the ALJ considers the evidence that post-dates the opinion and accounts in the RFC for any relevant changes in the claimant's condition. *See McGrew v.*

*Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *see also Smith v. Comm'r of Soc. Sec.*, No. 5:22-CV-01775-DAC, 2023 WL 5765876, at *14 (N.D. Ohio Sept. 7, 2023). An ALJ is tasked with determining a claimant's residual functional capacity after reviewing all of the evidence in the record. Here, the ALJ's decision shows that the ALJ did just that. *See* Tr. 17–35.

B. *Whether the ALJ had an obligation to have Kopcial's additional evidence reviewed by a medical provider and whether he failed to meet that obligation.*

Kopcial offered additional evidence—radiology reports from the October 2021 EMG and December 2021 MRI—after the medical opinions were submitted but before the ALJ held the hearing.[24] Kopcial claims that the ALJ erred by not obtaining an additional medical opinion in consideration of that new evidence. Doc. 8, at 16. Kopcial argues that the ALJ failed to fulfill his duty—heightened or otherwise—to develop the record, a responsibility that Kopcial claims belongs to the Commissioner in circumstances such as Kopcial's. Doc. 11, at 16–19. Kopcial is incorrect.

While an ALJ must ensure that every claimant receives a "full and fair hearing," the ultimate burden of proving entitlement to benefits lies with the claimant. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert.*

---

[24]    Both parties refer to the contents of the additional evidence without citation to the record. *See* Doc. 8, at 14; Doc. 11, at 16–17. Both recite its contents, however, as the notes from an October EMG and a December MRI with neither party mentioning any other evidence. *See* Doc. 8, at 14; Doc. 11, at 16–17. As such, when evaluating the ALJ's treatment of the additional evidence, I have considered its sum total to be the October EMG and December MRI notes.

*denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); 20 C.F.R. § 404.1512(a)). Although social security proceedings are inquisitorial rather than adversarial, that doesn't mean that the ALJ advocates for the claimant. *See Moats*, 42 F.4th at 563 ("Promoting the claimant's case, of course, is not the ALJ's obligation. The ALJ, remember, is a neutral factfinder, not an advocate.") (citing *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality opinion).

It is only under "extreme circumstances"—not present here—that the ALJ could be said to have a "special duty" to help develop the record. *See Moats*, 42 F.4th at 563–64 (discussing *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)). Kopcial, however, ignores *Moats* and its relegation of *Lashley* to "extreme" situations, cites several cases that cite *Lashley*, and argues that the ALJ erred by not developing the record. Doc. 8, at 14–18; Doc. 12, at 7–9. To the extent that Kopcial argues that the ALJ erred under *Lashley*, his argument fails. In *Lashley*, the claimant wasn't represented by counsel and only had a fifth-grade education. 708 F.2d at 150–52. A series of strokes left Lashley unable to articulate his thoughts and impaired his ability to read. *Id.* Here, in contrast, Kopcial was a "reliable historian" and college graduate who was represented by counsel and could articulate his thoughts while testifying. Tr. 40, 155, 278. So Kopcial hasn't shown that his case was an "extreme" situation in which the ALJ had a heightened duty to develop the record. *See Moats*, 42 F.4th at 564 (distinguishing *Lashley* and

declining to impose a duty-to-develop-the record-obligation even though the claimant was unrepresented).

The problem for Kopcial is that the rule on which his new-medical-opinion argument relies does not enjoy the support of binding legal precedent. Kopcial's claim stems from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008). In *Deskin*, the court held that:

> As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id.* (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). But *Deskin* isn't controlling, and it has received mixed reviews. *See, e.g., Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Berrier v. Comm'r of Soc. Sec.*, No. 3:20-cv-1655, 2021 WL 6881246, at *6 (N.D. Ohio Sept. 10, 2021) (citing cases that followed *Deskin* and those that did not), *report and recommendation adopted*, 2022 WL 189855 (N.D. Ohio Jan. 21, 2022). Indeed, "[a]fter some

criticism from other district courts in the Sixth Circuit, the *Deskin* court [in *Kizys*] clarified its decision" to hold "that *Deskin potentially* applies in only two circumstances." *Berrier*, 2021 WL 6881246, at *6 (emphasis added); *see also Kizys*, 2011 WL 5024866, at *2 ("Properly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test" and "*potentially* applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence") (emphasis added). And then the rule announced in *Kizys* that *potentially* applied eventually morphed into a requirement. *See Timothy R. J.*, 2023 WL 2258524, at *3 ("A medical opinion *must* also be obtained when "a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions.") (emphasis added).

The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove his case rests on the claimant, not the ALJ. *See Moats*, 42 F.4th at 563; 20 C.F.R. § 404.1512(a). Further, "the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.917(a)). While the ALJ has a

35

duty to conduct a "full inquiry," that duty "does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision." *Landsaw*, 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also* 20 C.F.R. § 416.919a(b)(1) (an ALJ may be required to obtain a consultative exam when "[t]he additional evidence needed is not contained in the records of [the claimant's] medical sources").

Here, although Kopcial says that the ALJ was "duty bound" to obtain a new statement from a medical source, Doc. 8, at 8, he hasn't shown why the record was insufficient for the ALJ to make a disability determination without such an opinion. *See Owens v. Berryhill*, No. 1:18-cv-1043, 2019 WL 2465229, at *13 (N.D. Ohio Feb. 13, 2019) (finding that the ALJ's RFC was supported by substantial evidence and noting that, "Owens, who was represented by counsel at the hearing, did not request a consultative examination or otherwise suggest the medical record was insufficient for the ALJ to make a disability determination," *report and recommendation adopted*, 2019 WL 1929695 (N.D. Ohio Apr. 30, 2019). Kopcial may disagree with the ALJ's RFC, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

2. *Whether substantial evidence supports the ALJ's determination that there were a significant number of jobs in the national economy that Kopcial could perform.*

Kopcial claims that the ALJ's RFC findings as to his manipulative limitations were "based upon an insufficient record"—one without an updated medical opinion that Kopcial continues to assert was required due to his additional evidence—and that this led to the RFC determination that Kopcial was capable of *frequent* handling and fingering when Kopcial believes he should have been limited to *occasional* handling and fingering. *See* Doc. 8, at 8–9, 19–20 (emphasis added). Vocational expert Coleman testified that a limitation to occasional rather than frequent handling and fingering bilaterally would be work preclusive for a hypothetical individual with the same age, education, and work experience as Kopcial. Tr. 67. Kopcial claims that the ALJ should have assessed his manipulative abilities as so limited that they were work preclusive. *Id.*, at 19. So, Kopcial claims, the ALJ should have found that he was disabled. Doc. 8, at 19–20. Kopcial is incorrect.

As noted, the ALJ's decision shows that the ALJ properly supported his findings regarding Kopcial's fingering, handling, and reaching abilities in the RFC with substantial evidence in the record and without the need for a new medical opinion. *See* Tr. 17–35. The ALJ used the RFC to generate appropriate hypotheticals for vocational expert Coleman at the hearing. *See* Tr. 65–68. The ALJ applied the information provided by Coleman to Kopcial's RFC and determined that a significant number of jobs existed in the national economy

that Kopcial could perform. Tr. 33. The ALJ thus determined that Kopcial was not disabled. Tr. 33–34. The argument that the ALJ should have come to a different conclusion regarding Kopcial's fingering, handling, and reaching abilities is an invitation to reweigh the evidence that the Court cannot accept. *See Rottmann*, 817 F. App'x. at 196; *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x at 588.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: October 20, 2023

*/s/ James E. Grimes Jr.*

James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)